BEYNON BUILDING CORPORATION, Plaintiff-Appellant, *v.* NATIONAL GUARDIAN LIFE INSURANCE COMPANY, Defendant-Appellee.

Second District   No. 82—852

Opinion filed October 5, 1983.—Rehearing denied November 10, 1983.

Gerald LaFayette, of Victor, LaFayette, Russell & Fuenty, of Rockford, for appellant.

Steven L. Nordquist, of Nordquist Law Offices, Ltd., of Rockford, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

The plaintiff, Beynon Building Corporation, appeals a judgment denying its complaint for a release from a mortgage held consecutively by the defendants, Rockford Mortgage Company (hereinafter Rockford) and National Guardian Life Insurance Company (hereinafter National), and reforming the mortgage and note secured by the mortgage. Although Rockford was named as a defendant, it was no longer in business and did not participate in the lawsuit. The following issues are presented for review:

(1) Whether the trial court erred in denying the plaintiff's motion to strike National's affirmative defenses.

(2) Whether the affirmative defense of mistake and the prayer for reformation were barred by the statute of limitations or by *laches*.

(3) Whether the affirmative defense of mistake and the prayer for reformation were barred by the statute of frauds.

(4) Whether National met its burden of proving that a mistake was in fact made on the mortgage and note.

On October 23, 1964, the plaintiff executed a mortgage and note with Rockford. The mortgage document provided that the plaintiff would pay:

"the principal sum of Eighty-Five Thousand and no/100 Dollars ($85,000.00) as evidenced by a principal promissory note of even date herewith, payable in 180 equal monthly installments

of Six Hundred Forty-Nine and 60/100 Dollars ($649.60) beginning December 15, 1964 and with a final payment November 15, 1979."

The installment note provided that the plaintiff would pay Rockford $85,000 as follows:

"Six Hundred Forty-Nine and 60/100 Dollars on the Fifteenth day of December A.D. 1964; Six Hundred Forty-nine and 60/100 Dollars on the Fifteenth day of each and every month beginning on the Fifteenth day of January A.D. 1965 for 178 months succeeding, and a final payment of Six Hundred Fortynine and 60/100 Dollars on the Fifteenth day of November A.D., 1979, with interest at the rate of $5\frac{1}{2}$ per cent. per annum, payable Monthly ***."

Rockford assigned the mortgage and note to National by a document also dated October 23, 1964.

The plaintiff made 178 monthly payments of $649.60. In September 1979, the plaintiff sent National a check for $1,299.20, with an accompanying letter explaining that it was to cover the final two payments and requesting a release of the mortgage. National refused to accept the check as the final payment and sent a reply letter explaining that an error had been made in drafting the original promissory note in that the correct monthly payments should have been $694.60 rather than $649.60.

When further attempts to obtain a release from the mortgage based on the 180th payment failed, the plaintiff filed a complaint for release from the mortgage on January 9, 1980. National filed an answer denying that the payments tendered by the plaintiff were in full payment of the mortgage. National also asserted as an affirmative defense that there was an inadvertent mistake in the amount of monthly payments shown on the note, that the mistake was discovered and in 1965 a new amortization schedule was sent to the plaintiff showing that amortization would take 200 rather than 180 months, and that the plaintiff's former president acknowledged the longer loan term in a letter written to National in 1973. The loan amortization schedule was dated November 18, 1965, and showed that payments of $649.60 at $5\frac{1}{2}\%$ interest would take 200 months, with the final payment due on August 15, 1981. The letter written by the plaintiff's former president in 1973 was a request for additional financing from National and stated, "The present mortgage balance is $51,695.06 and calls for payments of $649.60 through August of 1981 at $5\frac{1}{2}\%$ interest."

A hearing was held before the court. The general counsel for National testified that, according to an amortization booklet, the monthly

payments necessary to amortize an $85,000 loan at 5½% interest over 15 years (or 180 months) was $694.60. He concluded that a mistake had been made in the monthly payment figures but stated that National's records did not indicate that the discrepancy was discovered until 1979 when the "final payment" was tendered. No one from Rockford who was involved in the loan transaction was available to testify.

A local banker testified that he calculated the interest rate based on the amortization of an $85,000 loan over 180 payments at $649.60 to be about 4½%. He also testified that the prevailing prime rate in October 1964 was 4½%, according to the records of a local bank in existence at that time. The president of the plaintiff at the time the loan and mortgage were obtained acknowledged receiving the amortization schedule in 1965 and referring to its terms in his 1973 letter to National.

The court entered its judgment denying the plaintiff's complaint for release of mortgage and granting National's request for reformation of the mortgage and note so that the monthly payment would be $694.60 rather than $649.60, based on the parties' intentions that the loan be for $85,000 at 5½% interest for 15 years. The court found, based on testimony presented by National, that the balance due was $13,106.07, plus interest of $1,814 as of the date of trial, and the *per diem* interest was $2 per day.

It is undisputed that, given an $85,000 loan to be paid in 180 monthly payments, a 5½% interest rate and $649.60 payments do not compute. It is also clear that the interest rate was specified only in the note, as 5½%, and that the mortgage did not specify an interest rate. The other three terms—$85,000 for 180 months at $649.60 per month—were listed on both documents.

The first issue is whether the trial court erred in denying the plaintiff's motion to strike National's affirmative defense. In its motion to strike, the plaintiff stated that the mortgage spoke for itself and that the note referred to in the affirmative defense did not relate to the issue at hand, *i.e.*, whether the terms of the mortgage had been fulfilled. The plaintiff argues that the mortgage and note are two separate, independent documents and that only the terms contained in the mortgage document itself control whether its obligation has been fulfilled.

The plaintiff cites *Conerty v. Richtsteig* (1942), 379 Ill. 360, 365, for the principle that a note and mortgage are separate undertakings and the note wholly independent of the mortgage. The defendant in turn cites *Schultz v. Plankinton Bank* (1892), 141 Ill. 116, 121, for the

rule that a mortgage and note must be considered together and treated as one instrument. However, *Conerty* dealt with the rights and obligations of successive owners of mortgaged property, where the later owners assumed the mortgage and obtained extensions on the note, and *Schultz* dealt with whether a parol agreement entered into when a mortgage was executed was admissible to vary the contract as to payment of the notes. Neither case discussed the relationship of a mortgage and note where, as here, a mutual mistake of fact that would justify reformation was claimed.

■■■ Such a mistake results in the drawing of the contract itself. It is not a fundamental mistake relating to an essential element of the contract, which would prevent a meeting of the minds of the parties; rather, it occurs when an actual good-faith agreement is reached but, due to error, is not expressed in the written reduction of the agreement. (*Friedman v. Development Management Group, Inc.* (1980), 82 Ill. App. 3d 949, 954.) Thus, the mistake must have existed at the time of the execution of the instrument, must have been mutual and common to all parties, and must have been such that the parties intended to say one thing but by the written instrument expressed another. (*Sedlacek v. Sedlacek* (1969), 107 Ill. App. 2d 334, 337.) A mutual mistake exists when the contract has been written in terms that violate the understanding of both parties. (*Biren v. Kluver* (1976), 35 Ill. App. 3d 692, 696.) It is well settled that the parol evidence rule is no bar to the admission of evidence on the question of mutual mistake, and this is so even when the instrument to be reformed is clear and unambiguous on its face. (*Ballard v. Granby* (1980), 90 Ill. App. 3d 13, 16.) Thus parol evidence may be used to show the real agreement between the parties when a mistake has been made and the evidence is for the purpose of making the contract conform to the original intent of the parties. (*Stoerger v. Ivesdale Co-op Grain Co.* (1973), 15 Ill. App. 3d 313, 317.) Since National alleged that a mutual mistake was made on the mortgage document as to the correct amount of the monthly payments, the note was admissible as extrinsic evidence to establish the real intention of the parties.

■ In addition, section 2 of "An Act relating to mortgages of property of public utilities" (Ill. Rev. Stat. 1981, ch. 95, par. 52) provides that a mortgagee shall release a mortgage, if so requested, upon receipt "of all such sum or sums of money as are *really* due to him from the mortgagor." (Emphasis added.) National's assertion that there was indeed more money owing and that a mistake had been made on the document was sufficiently pleaded under section 2—613(d) of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110,

par. 2—613(d)) to raise that affirmative matter. Thus the trial court properly denied the plaintiff's motion to strike.

The next issue is whether the affirmative defense of mistake and the prayer for reformation were barred by the statute of limitations or by *laches*. The plaintiff's statute-of-limitations argument is premised on the contention that National discovered the alleged mistake in 1965 and that the cause of action therefore accrued then. The plaintiff notes that National's affirmative defense stated "that said error was subsequently discovered, and in 1965, this Defendant sent a new loan amortization schedule to Plaintiff ***," which is inconsistent with the testimony that National did not discover the error until the plaintiff's request for relief. The plaintiff relies on the 10-year period in section 13—206 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 13—206). The plaintiff's theory, then, is that the cause of action accrued at the time of discovery, which was 1965, and the 10 years ran before National sought reformation.

National responds that it had no actual knowledge of the mistake until 1979 when the plaintiff attempted to make a final payment and that, therefore, the request for reformation was timely. In addition, National suggests that the plaintiff's former president should have brought the mistake to National's attention in 1965 when he received the amortization schedule and that his failure to do so gave him unclean hands in a court of equity.

We found no Illinois case that addressed the application of the statute of limitations to an action for reformation based on mutual mistake. Although other States vary as to which statute of limitations applies (66 Am. Jur. 2d *Reformation of Instruments* sec. 90 (1969)), in Illinois the applicable statute is found in section 13—206 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 13—206), which provides:

> "Except as provided in Section 2—725 of the 'Uniform Commercial Code,' actions on bonds, promissory notes, bills of exchange, written leases, written contracts, or other evidences of indebtedness in writing, shall be commenced within 10 years next after the cause of action accrued; but if any payment or new promise to pay has been made, in writing, on any bond, note, bill, lease, contract, or other written evidence of indebtedness, within or after the period of 10 years, then an action may be commenced thereon at any time within 10 years after the time of such payment or promise to pay."

Other States are also divided as to when the appropriate statute of limitations begins to run against the right to sue for reformation.

In some States, the period commences when the facts that constitute the mistake are discovered or through due diligence should have been discovered; in others, it commences at the accrual of the cause of action, being the date of execution or delivery of the instrument. 66 Am. Jur. 2d *Reformation of Instruments* sec. 91 (1969).

██ ■ Illinois' statute generally follows the latter rule. Although National posits that the limitations period did not commence until 1979—the date it claims to have first actually discovered the mistake—the Illinois courts have rejected the "know or ought to know" rule as the time a limitations period begins to run. (*Sabath v. Morris Handler Co.* (1968), 102 Ill. App. 2d 218, 228-29.) Rather, the statute of limitations commences to run when the party to be barred has a right to invoke the aid of the court to enforce his remedy. (*Maxwell v. Nieft* (1942), 313 Ill. App. 354, 356.) Under the statute of limitations, a cause of action accrues when facts exist that authorize one party to maintain an action against another; thus the moment a creditor may legally demand payment the statute of limitations begins to run, because at that moment a cause of action has actually accrued. (*Mazur v. Stein* (1942), 314 Ill. App. 529, 534.) Even when an obligation is payable by installments and the statute of limitations runs against each installment when due, an action to determine the existence of the right under the contract is distinct as regards the commencement of the period of limitations, and the statute of limitations begins to run when the party first has the power to make the demand. (*Brehm v. Sargent & Lundy* (1978), 66 Ill. App. 3d 472, 474.) This effectuates the policy behind statutes of limitations, which are statutes of repose designed to prevent recovery on stale demands. The purpose of such statutes is not to shield a wrongdoer but to provide a sufficient opportunity to investigate factors upon which liability is based while such evidence is still ascertainable; thus, the statutes require diligence in initiating actions before the relevant facts are obscured by the lapse of time or the death, removal, or defective memory of witnesses. *Brehm v. Sargent & Lundy* (1978), 66 Ill. App. 3d 472, 475.

■ In the present case, the facts upon which the action for reformation was grounded existed in 1964 when the mortgage and note documents were drawn and executed. The cause of action therefore accrued at that time, rather than at the time when the discrepancy was actually discovered, and the limitations period began to run then.

National also argues that the statute of limitations does not apply because the plaintiff had reason to know of the mistake, in that it received the amortization schedule in 1965 and referred to it when making payments, and should have brought the error to National's atten-

tion before filing this suit. This argument is effectively one of estoppel.

■■ In *Sabath v. Morris Handler Co.* (1969), 102 Ill. App. 2d 218, the court discussed the circumstances in which one may be estopped from raising the defense of the statute of limitations. Estoppel exists independent of those things set forth in the statute itself as causing suspension. If a party's conduct has reasonably induced another to follow a course of action that otherwise would not have been followed and that would be to the latter's detriment if he did not later repudiate such course of action, an estoppel arises to prevent injustice or fraud. (102 Ill. App. 2d 218, 223.) The test is not whether the representation or conduct was fraudulent in the strict legal sense or done with an intent to mislead or deceive, but rather whether in all the circumstances of the case conscience and duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct. Although there is ordinarily no duty to apprise an adversary of his rights, one cannot justly or equitably lull his adversary into a false sense of security, causing him to subject his claim to the bar of the statute, and then plead the very delay caused by his course of conduct. (102 Ill. App. 2d 218, 225.) In *Reat v. Illinois Central R.R. Co.* (1964), 47 Ill. App. 2d 267, the court said that the general principles of equitable estoppel require the party asserting the estoppel to have relied on the act or representation and because of that reliance refrained from commencing an action within the limitations period; the conduct must have been of such character as to prevent inquiry, elude investigation, or mislead the party with the cause of action. (47 Ill. App. 2d 267, 273.) In addition, the "lulling" period must not have expired before the limitations period. 47 Ill. App. 2d 267, 274-75.

■■ In the present case, the totality of the circumstances justifies invoking the doctrine of estoppel. Although the plaintiff's silence upon receipt of the amortization schedule in 1965 would not alone be grounds for estoppel, the letter of 1973 acknowledged the terms of that schedule, even though they quite clearly differed from the note and mortgage by showing amortization over 200 rather than 180 months. This is analogous to the provision in the statute of limitations that, where a new promise to pay has been made in writing within or after the 10-year period, an action may be commenced within 10 years after that promise was made. Since the plaintiff had the amortization schedule, which clearly indicated that the loan would not be amortized according to the terms shown on the note and mortgage, and expressly acknowledged those terms as the terms of payment, it is not

equitable to permit the plaintiff to assert the statute of limitations as a bar.

■■ ■ Similarly, we reject the plaintiff's contention that the action for reformation is barred by *laches*. In fixing the period in which rights and claims will be barred by *laches*, equity follows the law, and generally courts of equity will adopt the period of limitations fixed by statute. Thus, where a party's rights are not barred by the statute of limitations, unless his conduct or special circumstances make it inequitable to grant him relief, he is not barred by *laches*. (*Wall v. Chicago Park District* (1941), 378 Ill. 81, 96.) Here, there is evidence that National acted promptly to assert its claim, after discovering the discrepancy and the plaintiff's intention not to pay according to the amortization schedule, and it would be inequitable to permit the plaintiff's assertion of *laches*.

■■ The next issue is whether the affirmative defense of mistake and the prayer for reformation were barred by the statute of frauds. This argument is predicated upon the plaintiff's understanding that National was relying on the letter and amortization schedule as a modification of the note and mortgage. The plaintiff posits that the amortization schedule lacked consideration, notice, and a signature and was therefore unenforceable under section 1 of "An Act to revise the law in relation to frauds and perjuries" (Ill. Rev. Stat. 1981, ch. 59, par. 1). However, National denies offering the amortization schedule and letter to establish a modification and explains that they were intended as evidence of the mutual mistake. Thus, the statute of frauds does not apply.

■■ ■ The last issue is whether National met its burden of proving that a mistake was in fact made on the mortgage and note. The plaintiff contends that evidence presented by National was insufficient to justify reformation. As the plaintiff notes, National's general counsel was not involved in the making of the note and mortgage, he acknowledged that the interest rate could have been listed incorrectly, and he did not know the parties' intentions or whether they ever arrived at any agreement regarding the monthly payment amount. In response, National argues that the evidence was uncontroverted that both parties intended to execute a mortgage for $85,000 over a 15-year period at 5½% interest. National believes that the installment payment figures were changed through an error and that it was a mutual mistake.

As the plaintiff points out, the burden of proving a reformation suit, which is on the party seeking reformation, is higher than that in an ordinary civil lawsuit. A written agreement is presumed to express

the intention of the parties and will not be reformed unless the evidence of mutual mistake or other ground for reformation is strong, clear, and convincing. (*319 South La Salle Corp. v. Lopin* (1974), 19 Ill. App. 3d 285, 290.) The mistake must be one of fact rather than law, the proof clear and convincing that a mistake was made, and the mistake mutual and common to both parties to the instrument. *Roots v. Uppole* (1980), 81 Ill. App. 3d 68, 72.

In the present case, there is no question that the terms on the written documents were inconsistent. Moreover, there is sufficient evidence to justify a conclusion that at some point the monthly payment figure was transposed to read $649.60 when it should have been $694.60, since the $694.60 figure was *exactly* consistent with the other terms. The suggestion that the interest rate was the mistaken term is less convincing since amortizing $85,000 over 15 years at $649.60 produces an interest rate of *approximately* 4½%.

██ The remaining question is whether the mistake was mutual. There is no testimony that the plaintiff was aware of the $694.60 figure and agreed to it before the mistake in drafting the documents was made. However, the 5½% interest rate was clear on the face of the note, was never challenged by the plaintiff during the 15 years it made payments, and was affirmed in the 1973 letter. There was thus sufficient evidence for the trial court to conclude that the true intent of the parties was to secure an $85,000 loan at 5½% interest for 15 years, justifying reformation of the instruments to reflect the correct monthly payment as $694.60.

The judgment of the circuit court of Winnebago County is affirmed.

Judgment affirmed.

SEIDENFELD, P.J., and LINDBERG, J., concur.