MICHIGAN AVENUE NATIONAL BANK, OF CHICAGO, as Conservator of John Carlisle Stumer, Incompetent, *et al.*, Plaintiffs and Counterdefendants and Appellees–Cross-Appellants, v. EVANS, INCORPORATED, Defendant and Counterplaintiff and Appellant–Cross-Appellee.

First District (2nd Division)   No. 87—2371

Opinion filed November 15, 1988.

BILANDIC, J., dissenting.

Arvey, Hodes, Costello & Burman, of Chicago (Irwin I. Zatz and Edwin A. Wahlen, of counsel), for appellant.

Gardner, Carton & Douglas, of Chicago (Michael P. Padden and Mary Beth Cyze, of counsel), for appellees.

JUSTICE EGAN delivered the opinion of the court:

The plaintiffs filed a declaratory judgment action against the defendant, Evans, Incorporated, for construction of a lease executed in 1978 on a store located in the City of Chicago (the Store). In substance, the plaintiffs-lessors claimed that the lease provided that the defendant-lessee was to pay rent based, in part, on a percentage of gross sales which were to include wholesale sales. Those sales, the plaintiffs claimed, included ones where delivery was made not only at the Store but ones where delivery took place elsewhere. The plaintiffs also claimed that gross sales were to include layaway charges, credit and finance charges and insurance renewals which were attributable to stores other than the Store. The complaint sought an accounting of all sums received by the defendant for wholesale sales and the other charges for a period beginning with the inception of the 1978 lease.

The defendant's answer contended that the rent based on percentage was restricted to retail sales. In the alternative, the defendant counterclaimed for reformation of the lease.

The trial court entered judgment for the plaintiffs on one of the five counts of its complaint and judgment for the defendant on three of them. One count had been withdrawn by the plaintiffs during the trial. The court ruled that the percentage rent was to include wholesale sales but restricted the accounting of those sales to a period of two years before the suit was filed. It denied the defendant's counterclaim for reformation. The court allowed the plaintiffs attorney fees and other costs and denied attorney fees to the defendant for its successful defense on three of the counts. The court denied the plaintiffs' claim concerning layaway charges, credit and finance charges and insurance renewals.

The defendant appeals from the judgment in favor of the plaintiffs on the rent, from the judgment against it on its counterclaim for reformation and on its denial of attorney fees. The plaintiffs cross-appeal from the order limiting their damage award to a period of two years, from the order denying them prejudgment interest from the date when percentage rent was "due" and from the order reducing their claim for attorney and accountant fees and denying their claim for paralegal fees. They do not appeal from the order denying their claim as to other charges.

The parties entered into a 15-year lease in 1962 under which the defendant rented the first five floors of the Store. The term was August 1, 1964, to July 31, 1979. The first four floors were used for retail sales while the fifth contained offices. The 1962 lease (Primary Lease) required the defendant to pay, in addition to a fixed amount, a

percentage of the gross sales "made in, at or from" the demised premises.

The lease also provided that the store was to be used for the "manufacturing, remodeling, storing, cleaning, sale and display of women's and misses' wearing apparel and women's and misses' wearing apparel accessories of every character and description and for the performance of incidental and related services." It added that, since the rental payable was in part based upon the volume of gross sales, the defendant would at all times conduct the premises as "primarily a store for the sale at retail of women's and misses' wearing apparel."

When the defendant needed more space in the building, it entered into additional leases for a particular area in the building. Those leases were called side or supplemental leases. Some of those leases were expressly for uses like display, storage of office supplies, photography, a computer room, storage of furs, executive offices, personnel and general offices. The rest of those leases provided that their purpose was the same as the purpose of the Primary Lease. Almost all of those leases were made subject to all of the terms of the Primary Lease.

In January 1977, the parties began negotiations for a new lease in anticipation of the July 31, 1979, expiration of the 1962 Primary Lease. The negotiations continued over a period of several months, producing several letters and drafts before the final agreement was executed on March 7, 1978. The lease included all of the demised premises which had previously been covered by 16 leases.

In 1979 or 1980 the defendant began selling furs to institutional or wholesale customers at markups of 20% to 25%. By fiscal year 1984 such sales had grown to about $4 million per year.

After the new lease had been in effect for several years, the plaintiffs' accounting firm examined the defendant's books and discovered that the defendant was making wholesale shipments from the Store but was not including them in the gross sales statements it was required to furnish. The plaintiffs notified the defendant of their claim, and the defendant responded, as it does here, that "gross sales" did not include furs sold at wholesale and shipped from the Store for delivery elsewhere. After a trial, the court held that they did.

We will first address the defendant's argument that the trial court's holding that the sales were made "in, at or from" the premises was clearly erroneous.

■ At the outset it is appropriate to respond to the defendant's arguments that the lease did not permit a wholesale operation, that by its terms the defendant was restricted to retail sales and that the

nature of percentage rent contemplates a retail operation where customers come to the store to make purchases. All those arguments we reject. The lease itself states that the premises shall be used "primarily," not exclusively, as a retail store. Moreover, the lease expressly excludes from gross sales "[m]erchandise sold at not more than gross cost to other retailers *** or to wholesalers." Those sales meet the definition of "wholesale sales." (*Stolze Lumber Co. v. Stratton* (1944), 386 Ill. 334, 342, 54 N.E.2d 554.) It necessarily follows that the parties recognized that the defendant might engage in wholesale sales, and if the sale was for more than gross cost, it would be subject to the percentage rental provision, assuming it was made "in, at or from" the premises. We have found no testimony in the record concerning such sales, but in oral argument the attorney for the defendant informed us that in practice the provision covered overstocked and damaged goods. Regardless of how the defendant had restricted its operation, the fact remains that it did participate in wholesale sales on the premises.

The defendant has also cited a law review article written by Denz, *Lease Provisions Designed to Meet Changing Economic Conditions*, 1952 U. Ill. L.F. 344, in support of its argument that, in construing the lease, a court should remember that this lease was not designed for wholesale purposes but, like its predecessor, "required" a retail operation.

First, we repeat that we cannot say that the leases "required" a retail operation. Second, the article does not purport to be an expression of the law. It is designed to be a practical guide to drafters of leases. It contains not a single case citation. Moreover, the article does not contain any pronouncement that wholesale sales may never be included in percentage leases. Instead, it simply says that percentage leases are "not adapted *** to *most* wholesale businesses." (Emphasis added.) See Denz, 1952 U. Ill. L.F. at 352.

██ Finally, the defendant's contention that the lease was meant to include only those transactions in which customers would come to the Store is rebutted by the fact that although the original and supplementary leases did not provide for mail-order sales, the defendant used the premises for mail-order sales for almost 15 years, implicitly recognizing that such sales were included in gross sales. This evidence is probative, since the court may consider the conduct of the parties indicating the construction of the agreement adopted by them. (*Cedar Park Cemetery Association, Inc. v. Village of Calumet Park* (1947), 398 Ill. 324, 75 N.E.2d 874.) The final lease provided expressly that mail-order sales were included in gross sales.

The wholesale operation began in 1979 or 1980. It was based on long-term contracts with institutional customers, requiring the customer to purchase a guaranteed amount of merchandise each year. Two locations were involved; one in New York City and the other at the Store. Customers could view a line of furs as presented in showrooms at the New York facility, at which wholesale buyers could meet with the defendant's representatives and have orders written up after making the selection.

At the same time the defendant established a wholesale division at the 13th floor of the Store. The furs for wholesale sales were kept in storage principally on the 13th floor. The long-term contracts were drafted and executed by the defendant's corporate counsel in offices at the Store. Customers did not execute those contracts at the Store but at some other location, such as their own stores. There was no showroom facility at the Store. Many of the customers selected the merchandise after viewing it in New York. Others made their selections from photographs or prior knowledge of the merchandise. About half of all such sales, imported furs, were shipped from the Store; the other half, domestic furs, were shipped from New York. The contract provided that title passed FOB when the goods were delivered to the carrier for shipment and that the defendant bore the risk of loss while the merchandise was on the dock prior to the carrier taking possession.

The New York facility employed 25 persons, 3 of whom worked part time on wholesale sales. The Chicago store had three full-time employees working on wholesale sales under the supervision of a wholesale manager who procured wholesale accounts and maintained existing ones. He identified several wholesale orders addressed to "Evans Wholesale Division" at 36 South State Street. An invoice was introduced in evidence which had printed on it "Evans Wholesale Division 36 South State Street." Whenever the Chicago office received a copy of an order, it sent the original to the New York office. Both New York and Chicago offices received copies of all the purchase orders. The personnel at the Store processed orders and verified that they were shipped as ordered.

The wholesale agreements provided for a twice-yearly caravan to be held at the Store. A caravan is a special promotion, and the defendant agreed to provide the furs. The customers would usually call the wholesale manager at the Store to tell him what goods they wanted delivered for those sales. The customers would often call the manager directly when they wanted to order imported furs. When a customer called with an order, the manager made a copy and shipped

the order to New York, although the merchandise would be shipped from Chicago. The Store had in-stock merchandise that it could use to fill an order immediately. The 13th-floor vault was used as a warehouse for wholesale furs. Credit approval was made, and payments were received, at the Store.

It thus appears that with respect to furs shipped from the Store, New York's only function was to receive copies of the orders that were to be filled and to provide a facility for selection by some, but not all, purchasers. As between Chicago and New York, contrary to the defendant's argument, the evidence is overwhelming that Chicago was the dominant location for the sales in question.

██ Since the lease does not define the term "sale," it will be assumed that the word is intended to be used in its usual meaning. (32 Ill. L. & Prac. *Sales* §2 (1957).) A "sale" consists in the passing of title from the seller to the buyer for a price. (Ill. Rev. Stat. 1985, ch. 26, par. 2–106(1); *Burrus v. Itek Corp.* (1977), 46 Ill. App. 3d 350, 354, 360 N.E.2d 1168.) Under the wholesale sale contract, the passing of title occurred when the goods were delivered to the carrier. Therefore, since the sale consists of passing of title, and title passed at the point of delivery to the carrier, the wholesale sales delivered to the carrier in Chicago occurred in Chicago, not New York, whether or not the purchase orders were "accepted" in New York, as the defendant urges.

The defendant's argument ignores the fact that the defendant's wholesale manager testified that it had no control where the wholesale accounts sent their purchase orders. In any event, a large number of orders were received in Chicago and the merchandise was then shipped pursuant to the Chicago order. New York simply received a copy of that order.

While not necessary to our decision, we feel obliged to express some doubt that the purchase orders represented "offers" requiring "acceptance" by the defendant either at Chicago or New York. The parties had already entered into contracts which required the buyers to purchase a minimum amount of furs in a certain period. It is fairly arguable that the purchaser's order constituted an acceptance.

The defendant argues that title passed when the furs were delivered to the carrier at the loading dock of the building which was not part of the demised premises. Therefore, it contends, the sale was not in, at or from the Store. The lease, however, gives the defendant the right to use the loading dock. That establishes that the sale was made at least "from" the Store.

██ █ The principal function of a court in construing a lease is to

discern and give effect to the intention of the parties as expressed in the language of the document when read as a whole. The court cannot remake a contract to give a litigant a better bargain than he himself was satisfied to make, and when the terms are clear and unambiguous, they must be enforced. (*Walgreen Co. v. American National Bank & Trust Co.* (1972), 4 Ill. App. 3d 549, 281 N.E.2d 462.) We judge that the terms are clear and unambiguous, and the trial court correctly held that the sales in question were made "in, at or from" the premises.

The court's holding is supported by extrinsic evidence as well. Where the terms of an agreement are claimed to be doubtful or uncertain, the court may consider the conduct of the parties indicating the construction of the agreement adopted by them. (*Cedar Park Cemetery Association, Inc. v. Village of Calumet Park* (1947), 398 Ill. 324, 75 N.E.2d 874.) In this regard, we note that the trial court heard testimony that, up until this dispute arose, the defendant treated the wholesale sales as Illinois sales for income tax purposes. The defendant's comptroller testified that this was due to an error in the accounting department which was discovered and changed after the lessors began making inquiries. The trial court was not required to accept that explanation and could consider the evidence as a manifestation of the defendant's construction of the terms of the lease.

Boiled down, the defendant's position is that the lease should be construed to mean that the percentage rental should be applied only to the first five floors and the fixed rent only to the rest of the premises. The lease does not restrict the defendant's use to any part of the premises. Therefore, it may be argued, acceptance of the defendant's position could mean that the defendant would be free to transfer its entire retail operation to any of the floors above the fifth floor and pay no percentage rent. *Cf. Fox v. Fox Valley Trotting Club* (1956), 8 Ill. 2d 571, 134 N.E.2d 806.

■ The legal effect of an agreement is to be enforced even if the parties arguably failed to express their real intention, since the parties' intentions are to be determined from the unambiguous language used. (*Schoen-McAllister Co. v. Oak Park National Bank* (1953), 349 Ill. App. 500, 111 N.E.2d 378.) The contract must be enforced as written, not as one party later finds he would prefer it to be written. *Sigma Delta Tau Society v. Alongi* (1976), 44 Ill. App. 3d 650, 358 N.E.2d 906.

■ The construction of an agreement given by the trial court will not be set aside unless contrary to the manifest weight of the evidence. (*Spircoff v. Spircoff* (1979), 74 Ill. App. 3d 119, 392 N.E.2d

363.) For a judgment to be against the manifest weight of the evidence, an opposite conclusion must be clearly evident. (*John Allen Co. v. Neuendorf* (1978), 60 Ill. App. 3d 559, 377 N.E.2d 365.) No such opposite conclusion is clearly evident in this case, and the trial court's judgment on count I of the complaint is affirmed.

The defendant argues next that the lease should be reformed because it intended that the new lease incorporate the 16 existing leases, expressing percentage clauses for five of the floors and fixed rentals for 11. We note that the only complaint for reformation we have found in the record asks that the lease be reformed by removing, from the percentage rental provision, rooms A and B of the sub-basement storage, the seventh-floor shipping space, the fifteenth-floor space used by the defendant for executive and general office purposes and the thirteenth- and nineteenth-floor storage and shipping spaces. The supplemental leases, however, also covered floors 6, 10, 16 and 18. The eighteenth floor was expressly restricted to use for photography purposes. The tenth floor was to be used for computers and general offices. Those four floors were not included in the prayer for reformation in the complaint. Our decision, however, would be the same if they were.

■ In order to entitle a party to reformation of a contract, he must show a mistake by *both* parties or a mistake by one party which is known and concealed by the other party. (*Ballard v. Granby* (1980), 90 Ill. App. 3d 13, 412 N.E.2d 1067.) The presumption exists that a written instrument conforms to the intention of the parties. (*Sheldon v. Colonial Carbon Co.* (1983), 116 Ill. App. 3d 797, 452 N.E.2d 542.) That presumption may be overcome only by clear and convincing evidence. (*Beynon Building Corp. v. National Guardian Life Insurance Co.* (1983), 118 Ill. App. 3d 754, 455 N.E.2d 246.) There is no evidence in the record that the *plaintiffs* intended or understood that the areas previously rented under the supplemental leases were not to be subject to the percentage rent requirement in the new lease. Even if it may be held that the defendant showed that it was mistaken, that is not enough. *Friedman v. Development Management Group, Inc.* (1980), 82 Ill. App. 3d 949, 403 N.E.2d 610.

■ Further, there is no suggestion, nor does the defendant argue, that the plaintiffs were guilty of any fraud or concealment. The parties negotiated over a long period of time through persons experienced in law, real estate and accounting. The defendant's corporate attorney testified that he viewed the 1978 lease to determine if it was consistent with the intent of his client and he believed that it was. He believed that a "scrivener's error" occurred when the lease did not

provide that the percentage sales were to apply only to the first four floors. But the evidence shows that some floors were used for both wholesale and retail sales. The defendant's comptroller testified that furs were shipped on occasion from the third floor under wholesale purchase orders and that the thirteenth floor was used for filling both retail and wholesale orders. We agree with the trial court's conclusion that the defendant failed to establish any mistake which would entitle it to reformation.

Both parties filed petitions for attorney fees. The defendant sought $60,000 and the plaintiffs, $37,000. The court denied any fees to the defendant and granted the plaintiffs one-third the amount sought. Both parties allege error.

The lease provided that each party was to pay the "other party's costs," including reasonable attorney fees, incurred in "enforcing the other parties [sic] obligations" or incurred in any litigation where the party incurring the costs "shall receive judgment in its favor."

We disagree with the plaintiffs' argument that the defendant is entitled to no attorney fees for its successful defense of three of the counts of the complaint. In support of their position, the plaintiffs insist that they, not the defendant, sought to enforce the other party's obligations. The plaintiffs' argument, however, ignores the other provision of the lease which grants attorney fees to a party who received "judgment in its favor." The Federal and foreign State cases cited by the plaintiffs concerning "prevailing parties" are not persuasive. They are based on specific language of a statute. Nor do we agree with the defendant that the court ignored its successful defense.

During oral argument, the attorney for the defendant told the trial court that the court could properly hold that this was a case where both parties should bear their own attorney fees. In his remarks before ruling, the judge said that he found much "duplication of work" by the attorneys for the plaintiffs, and he made it clear that he was taking into consideration the fact that the defendant did prevail on some of the counts. His remarks may be construed to mean that he was offsetting an unexpressed amount due the defendant from the amount due the plaintiffs. At least, it cannot be said that the record shows that the court gave no consideration to the fact that the defendant did come within the terms of the lease as a party that received judgment in its favor. Although neither party has argued, in the trial court or here, the effect of the court's ruling on the counterclaim for reformation, it is not unreasonable to infer that the court considered it. The defendant has not demonstrated error.

Awarding attorney fees and the proportion to be paid are within

the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. (*In re Marriage of Bussey* (1985), 108 Ill. 2d 286, 483 N.E.2d 1229.) We are unable to say that the proportion of attorney fees to be paid the plaintiffs represents an abuse of discretion.

■■■ We find no error in the trial court's reduction by one-half of the accountant fees paid by the plaintiffs and denial of any fees for work done by paralegals. Contrary to the plaintiffs' argument, the trial judge did articulate his reason for reducing the accountant's fees. He said that he did not think that the entire cost of the accountant should be born by the defendant "especially when there is only one [count] upon which the parties are successful."

The paralegal fees claimed were $848. The record indicates that the services included such things as indexing discovery documents, issuing subpoenas and delivering a copy of a brief to a judge's chambers. The court did not abuse its discretion in denying these costs. See *Losurdo Brothers v. Arkin Distributing Co.* (1984), 125 Ill. App. 3d 267, 465 N.E.2d 139.

■■■ The plaintiffs also contend that the court erred by limiting the period for which the defendant was to pay increased rent to two years before the filing of the suit on April 25, 1984, rather than for the period beginning with its first statement submitted to the plaintiffs after the commencement of the wholesale sale operation. The defendant relies principally on the following provision of the lease:

> "It is understood and agreed by and between the parties that notwithstanding the basis for determining the amount of percentage rental payable during each lease period shall be said periodic statements and said quarterly statements required to be furnished by the Lessee, the Lessors shall have the right to have such periodic statements and such quarterly statements and, the records and books of account of the Lessee, inspected, checked and audited at the office of the Lessee on the demised premises by a reputable firm of Public Accountants acceptable to the Lessee, at any time within two (2) years after any such sworn statement shall have been delivered to the Lessors and, in the event any such audit discloses any inaccuracies in such sworn statement, the percentage rental payable by the Lessee shall be finally determined and adjusted in accordance with such audit, and if such inaccuracies are more than four percent (4%) of the sworn statement as submitted, Lessee shall pay for such audit, but otherwise the expense of such audit shall be borne by the Lessors."

Another provision of the lease allowed the lessors to inspect and audit the sales records once a year for any period of time within the preceding three-year period and provided that the lessee need not keep such sales records for more than a three-year period.

The court construed these provisions to show an intention of the parties to treat the lessee's sales statements as accepted and approved after two years from their delivery unless an audit showed errors. The issue was presented to the court in the defendant's motion for summary judgment. The court denied the motion but restricted the plaintiffs' discovery to a two-year period preceding the filing of the complaint.

As is obvious, the defendant's position is not based on the express provisions of the lease; rather, it argues that the court should infer that the plaintiffs agreed to surrender a legal right to a 10-year limitation period because the defendant gave the plaintiffs the right to examine its books for two years and agreed to keep its books for three years.

The defendant has referred us to no case supporting its position nor has our research disclosed one. There are many cases, however, dealing with agreements purporting to limit liability or to limit the time within which a claim may be advanced. Such agreements purporting to limit time are not favored in the law and are construed strictly against the party invoking them. *Downing v. Wolverine Insurance Co.* (1965), 62 Ill. App. 2d 305, 210 N.E.2d 603; 54 C.J.S. *Limitations of Actions* §25 (1987); 22 Ill. L. & Prac. *Insurance* §525 (1956).

A position similar to the defendant's was taken in *President & Directors of Georgetown College v. Madden* (4th Cir. 1981), 660 F.2d 91. In that case the contractor contended that the parties had agreed to a one-year limitation, rather than the statutory 12 years, relying on a provision which required the contractor to remedy any defects in the work and pay for damages to other work resulting therefrom "which shall appear within a period of one year from the date of final acceptance of the work." The court of appeals rejected the contractor's argument, holding that the provision simply gave the owner certain rights for one year after the completion of the building, and it did not affect any of the remedies that were available to the owners after that time. *President & Directors of Georgetown*, 660 F.2d at 95.

The same reasoning applies to this case. The lease gave the lessors certain rights for a two-year period and imposed an additional obligation on the lessee to maintain records for three years. The grant of those certain rights to the plaintiffs and the imposition of an

additional obligation on the defendant do not by implication take away the plaintiffs' statutory right. Indeed, the section of the lease dealing with remedies specifically states that "all rights and remedies of the lessors herein enumerated shall be cumulative, and none shall exclude any other right and remedy allowed by law."

*Turoff v. Eastern Airlines, Inc.* (N.D. Ill. 1955), 129 F. Supp. 319, involved a suit for personal injury. The defendant airline relied on a time limitation in a tariff that the defendant had published. The ticket sold to the plaintiff recited that it was sold "subject to tariff regulations." The district court struck the airline defense, relying on the United States Supreme Court's pronouncement in a suit involving an agreement purporting to limit liability, *The Majestic* (1897), 166 U.S. 375, 41 L. Ed. 1039, 17 S. Ct. 597, in which the Supreme Court held that the terms of such an agreement must be "distinctly declared and deliberately accepted." (*The Majestic,* 166 U.S. at 386, 41 L. Ed. at 1043, 17 S. Ct. at 602.) There is no distinct declaration in this lease that the plaintiff was ceding its statutory right.

A court does not have the power by construction to write a new agreement into which the parties have not entered. (*Sigma Delta Tau Society v. Alongi* (1976), 44 Ill. App. 3d 650, 358 N.E.2d 906.) In our judgment the court's construction of the lease agreement to restrict the plaintiffs' right to recover to a two-year period was against the manifest weight of the evidence.

The plaintiffs' last assignment of error is the court's denial of their claim for prejudgment interest. The lease provided as follows:

> "Any amount due from Lessee to Lessors hereunder which is not paid when due shall bear interest at the rate of ten percent (10%) per annum from the date due until paid ***."

The defendant argued in the trial court, as it does here, that the amount became "due", as that term is used in the lease, only after the trial court made the finding on liability. The trial court accepted that argument and fixed the rate of interest at 10% to run from that date. At a later hearing the court accepted another argument by the defendant and reduced the interest to the statutory 9% covering judgments.

The judgment order included the following language:

> "Plaintiffs' request for interest on overdue rent at the rate of 10% per annum from the date *such amounts were due* is denied ***." (Emphasis added.)

Since the trial court gave no reasons for its holding and the language used in the judgment order seems at odds with the position urged by the defendant, we cannot be certain of the basis of the

court's decision. The defendant in this court repeats its argument that the amount became "due" when the trial court found on liability.

Again, since the lease itself does not define the term, it will be assumed that the word "due" is intended to be used in its usual meaning. The word was defined in *Roth v. Kaptowsky* (1948), 333 Ill. App. 112, 116, 76 N.E.2d 786, *aff'd* (1948), 401 Ill. 424, 82 N.E.2d 661, as "[o]wing, irrespective of whether the time of payment has arrived." In *Elkins v. Wolfe* (1892), 44 Ill. App. 376, 381, it was defined to mean "ought to be paid," "payable," "owing and demandable."

We believe that the plaintiffs' position is correct that the amount became due, that is "payable," or "owing" or "demandable" at the time that the defendant filed its required statements and not when the trial court made its finding of liability. The same issue was raised in *John Kubinski & Sons, Inc. v. Dockside Development Corp.* (1975), 33 Ill. App. 3d 1015, 339 N.E.2d 529. In that case the contract provided that the issuance of a final certificate of engineers was made a condition precedent to the release of any part of the amounts retained. The defendant argued that until the issuance of the certificate *or a legal excuse for its nonproduction had been judicially established,* no part of the sums became due under the contract. That argument was rejected by the appellate court and the plaintiff's right to prejudgment interest was upheld.

The plaintiffs' claim in this case was made under the contract and not the Interest Act (Ill. Rev. Stat. 1985, ch. 17, par. 6402); but it could have been brought under the statute, since it was an instrument in writing. (*Montgomery Ward & Co. v. Wetzel* (1981), 98 Ill. App. 3d 243, 423 N.E.2d 1170.) The difference would be that the plaintiff would be limited to 5% instead of 10%. There is no reason to test the plaintiffs' right to contractual interest by different standards than those used to determine a party's right to statutory interest. To recover under the statute, the party need only show an instrument in writing and that the amount due was fixed and determinable. An amount may be fixed and determinable even where it requires legal ascertainment. (*La Grange Metal Products v. Pettibone Mulliken Corp.* (1982), 106 Ill. App. 3d 1046, 436 N.E.2d 645.) As in *La Grange Metal,* the amount due here was capable of easy and exact computation. See also *Heissler v. Stose* (1890), 131 Ill. 393.

We emphasize that the statute distinguishes between claims for interest based on an instrument in writing and claims brought for unreasonable and vexatious refusal to pay. In claims brought for unreasonable refusal to pay, a good-faith dispute would preclude an award for prejudgment interest. It would not preclude an award for a claim

brought under a written instrument. (*Phelps v. O'Malley* (1987), 159 Ill. App. 3d 214, 511 N.E.2d 914.) The fact that the defendant disputed the claim here in good faith is not relevant. Since the plaintiff met the requirements of the law, the court had no discretion in the matter. *John Kubinski & Sons, Inc. v. Dockside Development Corp.* (1975), 33 Ill. App. 3d 1015, 339 N.E.2d 529.

We find no merit in the defendant's other argument that the plaintiffs' right to interest could be maintained only in an action at law and not in a declaratory judgment action. See *Albright v. Phelan* (1971), 2 Ill. App. 3d 142, 276 N.E.2d 1.

The trial court ordered that the plaintiffs were to recover the statutory interest of 9% covering judgments from the date of the judgment rather than the contractual rate of 10%. This ruling was correct. *United States Mortgage Co. v. Sperry* (1891), 138 U.S. 313, 34 L. Ed. 969, 11 S. Ct. 321; *Palmer v. Harris* (1881), 100 Ill. 276.

For these reasons, we reverse the judgment of the court restricting the plaintiffs' damages to a period beginning two years before the filing of the suit, and we reverse the judgment of the court denying the plaintiffs' claim for prejudgment interest. We remand the cause to the circuit court with directions to enter an award for appropriate damages consistent with this opinion and an award for prejudgment interest at the rate of 10% from the date to be fixed by the court consistent with this opinion until the date of the judgment, and at the rate of 9% thereafter. In all other respects the judgment is affirmed.

Judgment affirmed in part, reversed and remanded with directions in part.

SCARIANO, J., concurs.

JUSTICE BILANDIC, dissenting:

I agree with the majority that the trial court correctly ruled against Evans on its counterclaim. However, I respectfully dissent from the conclusion drawn by the majority that "wholesale sales" are included in the determination of percentage rental under the lease.

The percentage lease has its roots in the English feudal lease where the serf paid the lord of the land or "land-lord," an agreed portion of the crops he raised. This age-old principle is now applied to the retail business, substituting a percentage of the lease income for a percentage of the crops raised. Percentage leases are common in all urban centers throughout the country. See Denz, *Lease Provisions Designed to Meet Changing Economic Provisions*, 1952 U. Ill. L. F. 344, 351.

"Since the rent payable under a percentage lease is based upon business volume, it is applicable only when two factors exist:

(1) Goods or services are sold at retail.

(2) The volume of sales bears a direct relationship to the nature and location of the premises." Denz, 1952 U. Ill. L.F. at 351-52.

"[O]ne of the foremost purposes of percentage leases is to allow the landowner-lessor to receive a rental based on the value of the location of the leased premises; thus, it can be presumed that parties to a percentage lease intend that all receipts representing profit-making transactions reasonably related to the location are to be included in the calculation of percentage rentals." (Annot., 58 A.L.R.3d 384, 397 (1974).) In light of this purpose, the rental base should be presumed not to include sales to employees, transfers to branch stores, and sales to other stores at wholesale. The physical location of the business plays an insignificant role in these situations. Note, *Resolving Disputes Under Percentage Leases*, 51 Minn. L. Rev. 1139, 1150 (1967).

The lease executed on March 7, 1978, at the very outset identifies the parties, the demised premises, the term and a broad description of the use of the premises. The fixed rental of over $4½ million and the manner of payment is covered in one paragraph. Pages 4 through 15 of the lease are devoted to the percentage rental formula.

It is undisputed that the parties are well informed and experienced business people. Obviously they were aware of the purpose and function of a percentage lease. It is a tool that is not designed for a wholesale operation. Referring to Denz, *Lease Provisions Designed to Meet Changing Economic Conditions*, 1952 U. Ill. L.F. 344, the majority states:

> "Moreover, the article does not contain any pronouncement that wholesale sales may never be included in percentage leases. Instead, it simply says that percentage leases are 'not adapted *** to *most* wholesale businesses.' (Emphasis added.) [Citation.]" (176 Ill. App. 3d at 1052.)

The lease at bar does not specifically state between pages 4 and 15 that "wholesale sales" shall be included in computing percentage rental. On the contrary, the percentage rental provisions end at page 15 with a clear expression of a contrary intent.

> "In view of the fact that the rental payable to the Lessors under the terms of this Lease is in part based upon the volume of gross sales made in, at and from the demised premises, the Lessee covenants and agrees that during the term of this Lease, the Lessee *** will at all times maintain its corporate

existence and conduct in the demised premises *primarily a store for the sale at retail* of men's, women's and misses' wearing apparel \*\*\*." (Emphasis added.)

The final clause of the percentage rental provisions states:

"[T]he Lessee shall at all times during the term hereof continue to conduct and operate on the demised premises a store for the sale at *retail* of men's, women's and misses' wearing apparel of essentially the same character as the store heretofore conducted and operated in said Building by the Lessee." (Emphasis added.)

It is clear to me that the correct construction of the percentage lease provisions is that the percentage is computed primarily on the basis of *retail sales*. Likewise, it is clear that the parties did not intend to include "wholesale sales" as a part of the percentage formula.

The prior series of leases did not have a provision that specifically included "wholesale sales." The parties chose not to make a specific inclusion of "wholesale sales" in the percentage rental formula in the 1978 lease. This specific omission leads me to the conclusion that the parties did not intend to include "wholesale sales" as part of the percentage rental formula.

The analysis of the majority requires us to create an inclusion of "wholesale sales" by implication. "[W]here there is any doubt or uncertainty as to the meaning of the language used in a lease it should be construed most strongly against the lessor and in favor of the lessee." *J.B. Stein & Co. v. Sandberg* (1981), 95 Ill. App. 3d 19, 22, 419 N.E.2d 652; see also 24 Ill. L. & Prac. *Landlord & Tenant* §44 (1980).

It is important to recognize that the amount of rent to be paid to the lessor should be clear and unequivocal. It should not be the subject of speculation or require an inference or implication. There is no specific provision for inclusion of "wholesale sales." It is not appropriate for us to create one by implication.

Having determined that "wholesale sales" are not included in gross sales for the purpose of computing percentage rental, it is my opinion that the judgment of the trial court in favor of the plaintiff and against the defendant on count I should be reversed. This conclusion would require a reversal of the award of attorney fees to the plaintiff, render moot the extension of the percentage rental period and prejudgment interest, and require remandment to the trial court for determination of reasonable attorney fees to the defendant for its successful defense of all four counts of plaintiff's complaint.