RICHARD C. G'SELL, Plaintiff-Appellant, v. N. P. ASSOCIATES, LTD., *et al.*, Defendants-Appellees.

First District (1st Division)   No. 85—3478

Opinion filed February 9, 1987.—Rehearing denied April 7, 1987.

Edward T. Joyce and Richard S. Reizen, both of Joyce & Kubasiak, P.C., of Chicago, for appellant.

Kenneth B. Drost and Anthony G. Giglio, both of Katten, Muchin, Zavis, Pearl, Greenberger & Galler, of Chicago, for appellees.

JUSTICE O'CONNOR delivered the opinion of the court:

This is an appeal from a judgment declaring a written agreement null and void, barring enforcement of the agreement because of *laches*, ordering plaintiff to vacate an apartment in the building at issue, and denying defendants' claim for back rent and costs.

The record discloses plaintiff, Richard C. G'Sell (G'Sell), is a real estate developer who, since 1978, has resided at the North Park, a residential apartment building.

Defendant N. P. Associates, Ltd. (NP), is an Illinois limited partnership which was formed in September 1981 to acquire, own, and operate the North Park. NP is the beneficial owner of the Illinois land trust which owns the North Park.

Defendant F.S.W., Inc. (FSW), is an Illinois corporation which was organized in August 1981 to act as a general partner to defendant NP.

Defendant Enterprises is an Illinois partnership and a limited partner of NP. Enterprises' partners are 12 trusts established for the benefit of the Wilson family. John G. "Jack" Wilson (Wilson) is the managing partner of Enterprises.

Prior to 1981, G'Sell was a general partner in an Illinois limited partnership known as the 1931 North Lincoln Park West Partnership (the prior partnership), which owned the North Park prior to its sale in 1981 to a nominee of the Wilsons. In 1980, G'Sell learned that his partners in the prior partnership intended to sell the North Park. In order to sell on more favorable terms than they were able to secure, he contacted Jack Wilson and his father, Francis Wilson, with whom he had previously done business.

At the initial meeting between G'Sell and the Wilsons, G'Sell informed the Wilsons that he wanted to manage the North Park for them, that he wanted an ownership interest in the partnership that would acquire the North Park, and that he wanted to remain in his apartment at North Park. Defendant testified that G'Sell attempted to make the purchase attractive by emphasizing his expertise in obtaining Federal financing.

Negotiations between G'Sell and the Wilsons ensued, and various drafts of a proposed contract were exchanged. The negotiations cen-

tered on the terms of the sale of the North Park from the prior partnership to the Wilsons, the interest that G'Sell would have in the purchasing entity, and whether G'Sell would continue to manage the North Park for acquiring entity after the purchase.

The draft contracts culminated in the agreement at issue here, which Wilson executed and sent to G'Sell on or about April 15, 1981. G'Sell testified at trial that he immediately executed the agreement and returned it to Wilson. Wilson testified that G'Sell did not send him a copy of the executed agreement until February 24, 1984.

The agreement provided, in pertinent part:

"3. *Partnership*: Should we acquire the Property, the beneficial interest in the land trust at closing will be transferred to a Limited Partnership (the "Partnership") created pursuant to an agreement to be entered into having, among others, the following provisions:

(a) *General Partners*: You and Wilson Enterprises or its designee.

\* \* \*

(e) *Special Payment*: During the time the Partnership is the owner of the Property, you shall be entitled to occupy your present apartment rent-free."

Subsequent to Wilson's execution and delivery of the agreement but prior to the closing on the North Park, G'Sell indicated that he had a potential conflict of interest with his former partners by virtue of being both a buyer and a seller of the North Park. Wilson testified that G'Sell indicated that he was no longer interested in a partnership because the economics of the deal were unfavorable but that he still wanted to manage the property. Wilson also testified that because of G'Sell's conflict of interest and the deteriorating economics of the proposed acquisition, the parties made a new oral agreement prior to the closing establishing that G'Sell would manage the North Park for NP but would not be a partner in NP.

Prior to the closing, G'Sell also became involved in litigation with the former partnership which involved allegations that G'Sell had a conflict of interest because of his partnership interest with the Wilsons. G'Sell twice testified under oath that he had no understanding with the Wilsons concerning participation in a partnership to acquire the North Park. He also wrote a letter to his prior partners denying the existence of any understanding.

The closing of the transaction took place on September 15, 1981. G'Sell attended as a member of the former partnership. He was aware that at the time of the closing the Wilsons controlled the sole

general partner of the acquiring entity, but he made no objection at that time. The agreement of limited partnership creating NP, which G'Sell subsequently received, also did not include G'Sell as a general partner and did not include the special payment referenced at paragraph 3(e) of the agreement.

In support of their argument that there was no partnership agreement, defendants note that subsequent to September 15, 1981, G'Sell never included with his Federal income tax return any document reflecting a partnership interest in the North Park, nor did he claim the fair rental value of his apartment as income.

In support of plaintiff's assertion that a partnership agreement did exist, G'Sell cited a letter from Wilson to Acquisition Funding Corporation and two verified complaints in which G'Sell is referred to as a partner, general partner, or managing partner of NP. G'Sell also testified that he received quarterly financial statements for the North Park each quarter until this case was filed and that he had concluded, based on the fact that there was no net cash flow and net profit being generated by the North Park, that he was not being denied any benefits that he was entitled to as a partner pursuant to the agreement.

Following a bench trial, the trial court entered a judgment order declaring the agreement null and void, barred enforcement of the agreement because of *laches*, ordered G'Sell to vacate his apartment, and denied NP's claims for back rent and costs. Plaintiff now brings this appeal.

*Laches* involves the neglect or omission to assert a right in conjunction with a lapse of time which causes prejudice to an adverse party. (*Pyle v. Ferrell* (1958), 12 Ill. 2d 547, 552, 147 N.E.2d 341.) The decision to either invoke or refuse application of this defense is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. (*Beckham v. Tate* (1978), 61 Ill. App. 3d 765, 378 N.E.2d 588, *appeal denied* (1978), 71 Ill. 2d 606.) Whether *laches* will be applied is determined by the particular facts of each case. *Pyle v. Ferrell* (1958), 12 Ill. 2d 547, 147 N.E.2d 341.

In *Pyle* the court considered four factors in determining the applicability of this equitable defense: "(1) Conduct on the part of the defendant giving rise to the situation of which complaint is made and for which the complainant seeks a remedy; (2) delay in asserting the complainant's rights, the complainant having had notice or knowledge of defendant's conduct and the opportunity to institute a suit; (3) lack of knowledge or notice on the part of the defendant that the complainant would assert the right on which he bases his suit, and (4) injury or prejudice to the defendant in the event relief is accorded to

the complainant or the suit is held not to be barred." *Pyle v. Ferrell* (1958), 12 Ill. 2d 547, 553, 147 N.E.2d 341.

■■ Applying these principles to the instant case, it is clear that a *laches* defense is applicable. G'Sell admitted that he knew, at the time of the closing on September 15, 1981, that he was not being included as a general partner of the entity which acquired the North Park; he stated twice under oath that he had no interest in the North Park; he declared no partnership interest on his tax returns nor did he ever ask NP to supply him with documents to include with his returns. In addition, G'Sell took no action to enforce his purported rights until at least January or February of 1984, nearly three years after the closing. Accordingly, a finding of undue delay in asserting a known right is supported by the evidence.

G'Sell contends, to the contrary, that pursuant to Illinois law (Ill. Rev. Stat. 1985, ch. 110, par. 13—206), he has 10 years to bring suit to enforce the terms of the alleged agreement. This contention presumes the existence of a contract, which the trial court found did not exist. Moreover, *laches* operates to bar even a right within the statute of limitations if equity requires. Thus even if we were to disagree with the trial court on the issue of whether a contract existed, its enforcement could still be barred by *laches. Beckham v. Tate* (1978), 61 Ill. App. 3d 765, 767, 378 N.E.2d 588, *appeal denied* (1978), 71 Ill. 2d 606; *Slatin's Properties, Inc. v. Hassler* (1972), 53 Ill. 2d 325, 330, 291 N.E.2d 641.

G'Sell also contends that he was receiving "benefits" and, accordingly, was not on notice that he was being denied his rights. It is not clear what plaintiff defines as benefits, with the exception of the rent-free apartment. The use of the apartment, however, is not inconsistent with defendants' assertion that plaintiff was merely managing the property on defendants' behalf.

Nor are we persuaded by G'Sell's contention that he was misled by certain actions of the Wilsons to believe that he was a general partner. G'Sell claims that a letter written by Wilson to Charles L. Smead refers to G'Sell as "our partner." This letter was sent on April 15, 1981, and predates both G'Sell's request to be released from the partnership because of the conflict of interest with his prior partners and the closing of the sale of the North Park. Reliance on this letter after he had failed to assert his partnership interest at the closing is misplaced.

Plaintiff further argues that *laches* should not apply because defendants have not been prejudiced by G'Sell's delay in filing this action. He argues that whatever monies defendants contributed to

fund operating deficits for the North Park they were obligated to pay under the agreement. Under the terms of the agreement, however, Enterprises was only required to raise equity for the initial rehabilitation of the North Park, not for ongoing operation expenses. Irrespective of that issue, we concur with the trial court's finding that defendants would be prejudiced if G'Sell continued to occupy an apartment rent-free while he is no longer providing management services to Wilson Enterprises.

Since we find that the trial court's judgment in favor of defendant is proper on the basis of *laches*, we need not consider the waiver and estoppel arguments addressed by defendants.

For the foregoing reasons, we affirm the judgment of the trial court.

Judgment affirmed.

QUINLAN, P.J., and BUCKLEY, J., concur.