**Walter P. MAKSYM, Jr.,**
**Plaintiff–Appellee,**

v.

**Dolores LOESCH, Defendant–Appellant.**

**No. 90–2607.**

United States Court of Appeals,
Seventh Circuit.

Argued May 31, 1991.

Decided July 23, 1991.

Rehearing Denied Sept. 10, 1991.

Joseph M. Williams, St. Charles, Ill., for plaintiff-appellee.

William J. Harte, Herbert Stride, Stride & Associates, Chicago, Ill., for defendant-appellant.

Before CUDAHY, POSNER and RIPPLE, Circuit Judges.

POSNER, Circuit Judge.

This is a suit for breach of a contract between a lawyer and his client. Federal jurisdiction is based on diversity of citizenship, and Illinois law governs the substantive issues. The district judge granted summary judgment for the lawyer, awarding him $83,000 in damages (we round off all dollar figures to the nearest $1,000). The client's appeal raises some surprisingly fundamental issues concerning contracts for retaining lawyers.

Fred Loesch, a well-to-do businessman, died in 1978, survived by Dolores Loesch, who was his second wife and is the defendant and appellant in this case, and by two daughters by his first marriage. He left two wills, an earlier one leaving the estate to the daughters and a later one leaving it to Dolores. At Fred's wake, Dolores was served with process by the daughters, who had decided to contest the will. Shortly afterward she hired the plaintiff, attorney Walter Maksym, to be her "counsel in all

matters relative to the estate of [Fred Loesch]." The contract retaining Maksym, which he drafted in the form of a letter from her to him, and which she signed, goes on to provide that, as compensation for "the customary legal services to be rendered to me as the personal representative of the above estate," Maksym shall be entitled to a fee of 2.5 percent "of the total fair market value of the probate estate." The first $5,000 of the fee is to be paid upon Dolores's appointment as executrix, and the rest in three subsequent installments ending when the estate is closed. The contract further provides "that in addition to the above services, additional and extraordinary compensation may be necessary for the following extraordinary services." A list follows which includes the defense of the will contest. For these additional services Dolores agrees to pay Maksym at a rate of $100 per hour over and above the 2.5 percent of the estate's value. Finally, the contract states that "if for any reason I [Dolores] shall not be successfully appointed as executor of the estate ..., any compensation for any of the above services rendered on my behalf shall then constitute a personal obligation of mine payable at the hourly rate provided for above, and may not constitute an obligation of the estate."

Maksym represented Dolores Loesch both in her individual capacity and as executrix of her husband's estate for three years in a variety of matters. These included the sale of businesses that Fred Loesch had owned, the defense of the will contest brought by the daughters, and the defense of Dolores against both a fraud suit brought by a customer of one of the businesses and a constructive-trust suit brought (and won) by the daughters, charging Dolores with embezzling assets of the estate.

In 1981 Dolores Loesch discharged Maksym because she thought he was moving too slowly in selling one of Fred's assets. She had paid Maksym only $10,000 toward his fee. For his services to the estate, the probate court awarded him $31,000 in 1986. It also set aside the second will, the will that left everything to Dolores, as having

been procured by her use of improper influence over her husband, who was mentally incompetent when he signed the will. *In re Estate of Loesch*, 134 Ill.App.3d 766, 89 Ill.Dec. 680, 481 N.E.2d 32 (1985).

The estate was valued at almost a million dollars, which under the contract with Dolores made Maksym's fee for the "customary legal services" that he rendered to her in her capacity as executrix $24,000. To this he added his hourly billings for the extra services rendered (for example in the will contest)—$102,000—for a grand total of $126,000 to which he claimed entitlement under the contract. Dolores Loesch refused to pay, and in 1988 Maksym brought this suit in an Illinois state court, which Dolores, having become a citizen of Florida, removed to the federal district court in Chicago. Her defenses were twofold. First, the contract was unenforceable, because of fraud in either the execution or in the inducement, or on other grounds. Second, the contract did not extend to services that Maksym had rendered to Dolores in her personal capacity, as distinct from her capacity as executrix of Fred's estate. Therefore Maksym was limited to his alternative claim in quantum meruit for the value of those services—a claim that as it happened was (she argued) barred by the statute of limitations. The district judge rejected these defenses, finding this easier to do because Dolores's counsel had failed to comply with Rule 12(m) of the U.S. District Court for the Northern District of Illinois. That rule requires the party opposing a motion for summary judgment to state separately and with supporting documentation his disagreement with any factual assertions in the motion, on pain of having the asserted facts deemed admitted. Subtraction of the $10,000 that Maksym had received from Dolores and the $31,000 that he had received from the estate yielded (after minor adjustments) the $83,000 that the district court awarded him, precipitating this appeal.

■ We have approved strict enforcement of Rule 12(m) repeatedly. *Appley v. West*, 929 F.2d 1176, 1179 (7th Cir.1991) (per curiam); *Skagen v. Sears, Roebuck &*

*Co.,* 910 F.2d 1498, 1500 (7th Cir.1990); *Bell, Boyd & Lloyd v. Tapy,* 896 F.2d 1101, 1103 (7th Cir.1990); *Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir.1989). Dolores Loesch's appellate counsel concedes that her trial counsel (who was from a different firm) failed to comply with the rule. The failure is puzzling. Not only is the attorney in question an experienced Chicago practitioner, but it was he who chose to litigate this case in federal court by removing it from the state court in which Maksym had filed it. At argument Loesch's appellate counsel told us that the reason for the failure to comply with the rule was that trial counsel had delegated the preparation of the memorandum in opposition to Maksym's motion for summary judgment to an inexperienced associate. Needless to say, that is no defense; the district judge was therefore on solid ground in deeming the facts that Maksym had asserted in the motion for summary judgment to be admitted.

██ Among those facts are that Dolores Loesch knew that she signed the contract to retain Maksym, that the contract provided for retention of Maksym as her counsel in both her capacity as executrix and her individual capacity, and that the $100 an hour billing rate in the contract was proper for a lawyer of Maksym's experience. The first admission scotches Mrs. Loesch's claim (a claim that is not a little ironic in light of the outcome of the will contest) that Maksym had slipped the contract in among a bunch of other papers without telling her what it was and that she signed it without knowing what it was, thinking it routine. Had he done this it would have been fraud, all right—fraud in the execution of the contract, *Belleville National Bank v. Rose,* 119 Ill.App.3d 56, 59, 74 Ill.Dec. 779, 781, 456 N.E.2d 281, 283 (1983); 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 4.10 at pp. 402–03 (1990). But the claim that he did this is barred by the violation of Rule 12(m). It is also inconsistent with the uncontested facts concerning when Maksym received the papers that he allegedly slipped the retainer agreement in among—it was *after* Mrs. Loesch signed it.

██ Of course, she might have known what she was signing yet have been induced to sign it by fraud. But of this there is no evidence. Her counsel tries to plug this gaping hole in his case by arguing that because lawyers are fiduciaries all contracts between lawyers and their present or even prospective clients are presumptively fraudulent if the lawyer benefits from the contract. As no one enters into a contract without hope of benefit, this argument if accepted would make all lawyers' contracts presumptively unenforceable. We should not lightly assume that the Illinois courts intend so fell a consequence of the fiduciary principle.

██ What is true is that a lawyer is a fiduciary of his client and that a fiduciary is presumptively barred from self-dealing at the expense of the person to whom he stands in a fiduciary relationship. For the application of this principle to lawyers, see *Franciscan Sisters Health Care Corp. v. Dean,* 95 Ill.2d 452, 465–66, 69 Ill.Dec. 960, 966, 448 N.E.2d 872, 878 (1983); *In re Imming,* 131 Ill.2d 239, 256, 137 Ill.Dec. 62, 69, 545 N.E.2d 715, 722 (1989); *Anderson v. Sconza,* 179 Ill.App.3d 202, 206, 128 Ill. Dec. 263, 266, 534 N.E.2d 445, 448 (1989); *Coughlin v. SeRine,* 154 Ill.App.3d 510, 515, 107 Ill.Dec. 592, 596, 507 N.E.2d 505, 509 (1987); *Durr v. Beatty,* 142 Ill.App.3d 443, 449, 96 Ill.Dec. 623, 628, 491 N.E.2d 902, 907 (1986). Had Maksym bought assets from Fred's estate at a profit to himself, or (as in the *Franciscan Sisters* case) drafted a will of which he was a beneficiary, he would have a lot of explaining to do. The presumption that self-dealing in the course of a fiduciary relationship is indeed a form of fraud—usually called "undue influence," perhaps to emphasize that fiduciaries are held to a higher standard than other contracting parties—can be rebutted, but the fiduciary must present clear and convincing evidence that the terms of the transaction were fully disclosed and that the transaction was supported by adequate consideration. *Franciscan Sisters Health Care Corp. v. Dean, supra,* 95 Ill.2d at 465, 69 Ill.Dec. at 966,

448 N.E.2d at 878; *Durr v. Beatty, supra,* 142 Ill.App.3d at 450, 96 Ill.Dec. at 628, 491 N.E.2d at 907. In some cases rebuttal may require the fiduciary to prove that his principal received independent advice about the transaction. *In re Imming, supra,* 131 Ill.2d at 256, 137 Ill.Dec. at 69–70, 545 N.E.2d at 722–23. In summary, "the burden of proof is upon the attorney to show the fairness of the agreement, the utmost good faith, complete disclosure on his part and a full understanding of all the facts and legal consequences on the part of the client." *Corti v. Fleischer,* 93 Ill.App.3d 517, 522, 49 Ill.Dec. 74, 78, 417 N.E.2d 764, 768 (1981). See also 2A *Scott on Trusts* § 170, at p. 312 (4th ed.1987).

Most of the lawyer undue-influence cases involve what might be termed collateral dealings between lawyer and client—loans, sales, a will naming the lawyer as a beneficiary, and so forth. But not all. *Anderson* and *Durr* involved fee contracts, and it is in *Durr* that we read that "a presumption of undue influence arises when an attorney enters into a transaction with his client during the existence of the fiduciary relationship." 142 Ill.App.3d at 450, 96 Ill.Dec. at 628, 491 N.E.2d at 907. The word "during," however, deserves emphasis. In both *Anderson* and *Durr* the challenged fee contract had been made long after the lawyer-client relationship had been established. Fiduciary law does not send the dark cloud of presumptive impropriety over the contract that establishes the fiduciary relationship in the first place and fixes the terms of compensation for it. "The courts of Illinois have given particular attention to contracts made or changed *after* the relationship of attorney and client has been established; it is generally held that *such* contracts are presumptively fraudulent." *Corti v. Fleischer, supra,* 93 Ill.App.3d at 522, 49 Ill.Dec. at 78, 417 N.E.2d at 768 (emphasis added). See also *Durr v. Beatty, supra,* 142 Ill.App.3d at 449, 96 Ill.Dec. at 627, 491 N.E.2d at 906; *Anderson v. Sconza, supra,* 179 Ill.App.3d at 206, 128 Ill.Dec. at 266, 534 N.E.2d at 448; cf. *In re Beverly Crest Convalescent Hospital, Inc.,* 548 F.2d 817, 819–20 (9th Cir.1976). Most fiduciary relationships are established by contract and are not eleemosynary, yet the contracts establishing them are held valid without the court's imposing on the lawyer or other fiduciary the difficult burden of demonstrating that he made full disclosure of the terms of the contract and that those terms were "fair," whatever exactly that means. Cases so holding with respect to retainer agreements made at the outset of the lawyer-client relationship include *In re Estate of Harnetiaux,* 91 Ill.App.2d 222, 2238, 234 N.E.2d 81, 84 (1968), and *Sokol v. Mortimer,* 81 Ill.App.2d 55, 60–63, 225 N.E.2d 496, 499–500 (1967). We have found no recent cases, but perhaps only because the principle is so well established and so sensible.

■ The principle is clear, but not the application. For when exactly does the lawyer-client relationship begin? Even before Mrs. Loesch signed the letter formally retaining Maksym, they had had some discussions regarding the case, and we may assume that anything she told him about the case was covered by the lawyer-client privilege. It does not follow that the lawyer-client relationship began that soon when the question is whether the rule of presumptive impropriety applies. The purpose of the rule is to protect the reasonable expectations of the person who reposes confidence in an agent who, he has been led to believe, will treat his affairs with the same solicitude with which the agent would treat the agent's own affairs. The creation of these expectations is not instantaneous, and we may assume therefore that a retention agreement signed shortly after the first meeting between the parties is not subject to the rule of presumptive impropriety. It is quite otherwise if the agreement is signed months later (as in the *Anderson* and *Durr* cases), when, as is common, the fiduciary relationship has flowered without benefit of a written agreement. At that point the lawyer or other fiduciary has an ascendancy over his client, a position of trust, that may enable him to drive too hard a bargain; and it is against this danger that the presumption is directed. The danger was not present here. According to the facts that Rule

12(m) requires that we deem admitted, Mrs. Loesch first discussed representation with Maksym "in or about October, 1978," the retainer agreement was signed on October 19, and representation commenced then. The last "fact" may well be a legal conclusion, and thus outside the scope of Rule 12(m) (which is limited to material facts). But there is no reason to think that Maksym performed any significant work on the matters for Mrs. Loesch before the retainer agreement was signed. Mere preliminary discussions—the courtship leading up to the agreement—are not enough to bring the presumption of voidability into play.

■■■ But what are we to make of the charge in Dolores Loesch's affidavit that Maksym failed to explain the terms of the retainer agreement when he presented it to her for her signature? Maksym denies this, also by affidavit, but ordinarily a clash of sworn testimony on a material issue of fact precludes the grant of summary judgment. However, the failure of one party to explain the terms of a written contract to the other before the other signs is not fraud, or undue influence, *Chicago Pacific Corp. v. Canada Life Assurance Co.*, 850 F.2d 334, 337 (7th Cir.1988); *Comprehensive Accounting Corp. v. Rudell*, 760 F.2d 138, 140 (7th Cir.1985), even if the contract creates a fiduciary relationship. (Besides the cases cited earlier which refuse to apply the presumption of impropriety, with its requirement of full disclosure, to initial retention agreements, see *A Sealed Case*, 890 F.2d 15, 17 (7th Cir.1989).) Nor do the rules of professional responsibility that govern the conduct of lawyers require the lawyer to explain to a prospective client the terms of the retainer agreement that he wants the client to sign. Under the Illinois Code of Professional Responsibility in force in 1978 when this retainer agreement was signed, all the lawyer had to do as a matter of professional responsibility, so far as pertinent here, was to avoid charging illegal or excessive fees. Rule 2–106(a). (He had to make full disclosure of any business transactions during the period of representation that created a conflict of interest, Rule 5–104, but that is not an issue here.) Illinois has since adopted the Model Rules of

Professional Responsibility under the name "Illinois Rules of Professional Conduct." They require not only that fees be reasonable but also that the basis for the fees be communicated to a new client "before or within a reasonable time after commencing the representation." Rule 1.5(b). The new rules are not applicable to this case. Nor were they violated. The retainer agreement—which Mrs. Loesch received and signed before, or when, or certainly within a reasonable time after representation commenced—set forth the method of computing the lawyer's fees.

If the failure of a lawyer to make comprehensive disclosure at the time of commencing representation were considered a form of fraud, lawyers would obtain little protection against fee disputes by putting their retainer agreements in writing, since merely by denying that the lawyer explained the agreement orally before the client signed it the client could get to the jury on the issue of fraud. Rules of professional responsibility should be enforced by means of disciplinary proceedings rather than by expansion of the concept of fraud to the point at which it will destroy the value of written contracts in withdrawing contractual disputes from juries. *Cross v. American Country Ins. Co.*, 875 F.2d 625, 628 (7th Cir.1989) (Illinois law); *Corti v. Fleischer, supra*, 93 Ill.App.3d at 532, 49 Ill.Dec. at 84, 417 N.E.2d at 776; *Reed Yates Farms, Inc. v. Yates*, 172 Ill. App.3d 519, 530, 122 Ill.Dec. 576, 583–84, 526 N.E.2d 1115, 1122–23 (1988). *Marvin N. Benn & Associates, Ltd. v. Nelsen Steel & Wire Co.*, 107 Ill.App.3d 442, 447, 63 Ill.Dec. 251, 255, 437 N.E.2d 900, 904 (1982), holds to the contrary—holds that a contract that violates a rule of professional responsibility is unenforceable—but *Cross*, citing later Illinois decisions, concluded that this holding was not an accurate statement of Illinois law. The intermediate position, which is supported by *Corti v. Fleischer, supra*, 93 Ill.App.3d at 532, 49 Ill.Dec. at 84, 417 N.E.2d at 776, is that the rules of professional responsibility, insofar as they are designed for the protection of lawyers' clients (not all of the rules are), furnish

potentially useful guidance to courts called on to decide whether a particular contract between a lawyer and his client was a product of undue influence. That cannot help Mrs. Loesch, however, because no such rule was violated.

Of course, even if as we believe a violation of the rules of professional ethics does not make a lawyer's contract with his client voidable per se, conduct which violates both professional ethics and contract law, such as the charging of exorbitant fees by a lawyer, is not placed beyond the reach of contract law because it violates professional standards as well. *Coughlin v. SeRine, supra,* 154 Ill.App.3d at 514, 107 Ill.Dec. at 596, 507 N.E.2d at 509; *Pocius v. Halvorsen,* 30 Ill.2d 73, 83, 195 N.E.2d 137, 142 (1964). Illinois law recognizes, moreover, that a contract for professional services can be rendered unenforceable by being found to be contrary to public policy. *Cross v. American Country Ins. Co., supra,* 875 F.2d at 628–29, and cases cited there. But, as *Cross* also explains, not every violation of every rule of professional responsibility can be assumed to be the kind of grave, injurious, and nontechnical violation of a strongly established public policy that justifies the voiding of a contract. *Id.*

We do not suggest that a failure to explain the terms of a contract can never be an element of a fraud case. Suppose the terms were unusually favorable to the lawyer, or unusually opaque; either circumstance might in combination with evidence that the lawyer had not explained its terms before the prospective client signed justify an inference of fraud. Compare *Northwestern National Ins. Co. v. Donovan,* 916 F.2d 372, 377 (7th Cir.1990). That is not possible in this case, however, because so far as the record and our own experience shows, the retainer agreement that Maksym submitted to Dolores Loesch and that she signed is standard. We know she wanted to hire Maksym, and he offered her standard terms for the retainer. In these circumstances what difference could it have made whether he explained the terms to her or not?

This discussion brings out the important point that fraud has both a "procedural" and a "substantive" aspect. A contract will not be set aside on grounds of fraud unless the process by which it was formed was so distorted that it cannot be assumed to represent the joint preferences of the parties. This is the procedural aspect. But unless the contract is also one-sided—that is, substantively "unfair"—it will be difficult to show that any distortion in the process of contract formation was material. Indeed, it may be difficult to show there *was* distortion. A party charged with fraud is unlikely to admit the charge. The jury will have to infer fraudulent conduct from a clash of testimony. As a practical rather than doctrinal matter the resolution of the clash may depend critically on whether the contract is sufficiently one-sided (ex ante—that is, it did not just turn out badly for the plaintiff; it was *calculated* to go badly for him) to make the charge of fraud plausible. In this case the contract was not one-sided at all—in fact if Mrs. Loesch is correct in her alternative claim that the contract doesn't even cover the services that Maksym rendered to her in her personal capacity as distinct from her capacity as executrix of her late husband's estate (but she is incorrect, as we shall see), the contract was from Maksym's standpoint not extortionate but inadequate. Since it was not one-sided, it is hard to see what difference it made if Maksym did fail to explain the terms of the contract in advance to his client. Indeed, the fact that its terms were standard would be a reason not to bother to explain them in advance—maybe not a good reason but a good enough reason to defeat a claim of fraud.

We need not consider Maksym's defense of ratification. Mrs. Loesch accepted the benefits of the contract for three years, and this gives rise to a presumption that she waived any claim of fraud in the inducement. *Mellor v. Budget Advisors, Inc.,* 415 F.2d 1218, 1220–21 (7th Cir.1969); 1 Farnsworth, *supra,* § 415, at pp. 426–27. The presumption is not irrebuttable, however; she may not have wised

up to the fraud within the three-year period. We need not pursue the question, since there was no fraud.

She argues in the alternative that the contract is unenforceable because it was terminated before Maksym had completed the performance of his side of the contract. The evaluation of this argument requires us to distinguish three types of case. In the first the performing party (Maksym) breaks his side of the contract and is terminated for cause. Provided the breach is material, *Casio, Inc. v. S.M. & R., Inc.*, 755 F.2d 528, 532 (7th Cir.1985) (applying Illinois law); *Dr. Franklin Perkins School v. Freeman*, 741 F.2d 1503, 1518 (7th Cir.1984); 2 Farnsworth, *supra*, § 8.12, the contract is then unenforceable, the breach having excused the payor (Mrs. Loesch). *Goldstein v. Lustig*, 154 Ill. App.3d 595, 599, 107 Ill.Dec. 500, 503–04, 507 N.E.2d 164, 167–68 (1987); *Kobus v. Jefferson Ice Co.*, 2 Ill.App.3d 458, 460, 276 N.E.2d 725, 727 (1971).

In the second type of case the termination is wrongful, and of course the payor remains fully liable under the contract. However, this principle has a distinctly limited scope in Illinois with respect to contracts with lawyers. Illinois law entitles a client to discharge his lawyer (without liability) at any time, with or without cause, *Rhoades v. Norfolk & Western Ry.*, 78 Ill.2d 217, 227–28, 35 Ill.Dec. 680, 685, 399 N.E.2d 969, 974 (1979); hence the client who discharges his lawyer without cause is not breaking their contract. Because the right of discharge at any time without liability would mean little were the client obliged to pay the lawyer the contractually specified fee regardless of how little work the lawyer had actually done for the client, and because the law limits lawyers to a reasonable fee, the Illinois courts have concluded that a client who discharges his lawyer, on any ground or no ground, is liable only for the fair value of the services the lawyer has rendered, and not for the contractually specified fees if they exceed that value. This rule was applied in the *Rhoades* case to prevent a lawyer from collecting his 25 percent contingent fee when the client discharged him before he had done significant work on the case, and in *Simon v. Auler*, 155 Ill.App.3d 1000, 108 Ill.Dec. 525, 508 N.E.2d 1102 (1987), and *In re Marriage of Savas*, 139 Ill.App.3d 68, 77, 93 Ill.Dec. 483, 490, 486 N.E.2d 1318, 1325 (1985), to prevent the lawyer from pocketing a large retainer when the contract was terminated before he rendered the services for which the retainer was intended to compensate him. These cases should thus be understood as preventing forfeitures.

In Illinois, therefore, lawyer-client contracts belong to the third type of case we said we had to distinguish, cases where the termination of the contract is neither for cause, nor wrongful. The contract is at an end without liability for breach on either side. Yet the general rule for the third type of case is not that the terminated party is remitted to his remedy in quantum meruit—the Illinois approach in lawyer cases—but that he remains entitled to compensation according to the terms of the contract for the services performed to date. 3A *Corbin on Contracts* § 247, at p. 104 (1960). And occasionally we find the general rule followed in lawyer cases. *Reed Yates Farms, Inc. v. Yates, supra*, 172 Ill.App.3d at 528–29, 122 Ill.Dec. at 582–83, 526 N.E.2d at 1121–22; Comment, "The Application of Quantum Meruit to Attorney Fee Litigation," 49 *La.L.Rev.* 215, 222–23 (1988).

The rationale of the general rule is that a contract which is terminable (without constituting a breach of the contract) without any need to show cause for the termination is a contract terminable at will. When it expires "naturally," as it were, by being terminated by either party without breach or liability, the only money owing to either is money that has accrued from the past performance of the contract, and termination does not affect the accrued liability. This approach makes good sense, but can it be reconciled with the principle of *Rhoades* and other Illinois cases that the lawyer must prove the value of his services in any case in which he has been discharged? The answer requires a distinc-

tion between expected and accrued fees. When the lawyer is seeking to collect (or retain) a retainer fee or a contingent fee, he is not charging for services actually rendered. But when he *is* charging for services actually rendered, the contractual specification of the fee for those services controls, unless the court finds that it is exorbitant. For then he is merely seeking payment for services rendered before the client terminated the retention. There is no mismatch between services and compensation, and by the same token the lawyer's being able to obtain the contractually specified payment is not a deterrent to termination, because it involves no element of forfeiture. Neither of the grounds for the rule of *Rhoades* and the cases following it is present in such a case, and the rule is therefore inapplicable.

That is essentially this case. On the one hand, Maksym does not and could not question Mrs. Loesch's right to discharge him because of dissatisfaction with the pace of his efforts to liquidate the assets in the estate, whether or not that dissatisfaction was warranted. On the other hand, she does not claim, notwithstanding her impatience (an impatience that may have been the other side of the charges of misappropriation that the daughters brought against her), that he violated his obligations to her under the contract by which she retained him as her lawyer. The question therefore is whether Maksym's entitlement to fees is governed by the contract because he is seeking to recover accrued fees, based on actual services rendered; or by the principles of quantum meruit. That it is the former is clear with respect to the hourly compensation, which is mechanically computable under the contract by multiplying the number of hours of service provided before Mrs. Loesch discharged Maksym by the contractually specified hourly billing rate of $100. It is an admitted fact, remember, that the rate is reasonable, and it is being applied to hours of service actually rendered.

■ The other component of the contractually specified compensation—the 2.5 percent of the market value of the estate—is trickier, because if Maksym had been discharged before he had completed performing the legal services customary in an estate matter, a fee equal to 2.5 percent of the estate's value would have been in the nature of a retainer or a contingent fee, rather than a fee for services actually rendered already. Two points establish, however, that even this component of the fee does not belong in the quantum meruit bin. First, Maksym must in fact have completed the contemplated services, for the probate court valued those services at $31,000, which is more than 2.5 percent of the estate's value ($24,000). Second, Mrs. Loesch has no standing to complain about the 2.5 percent component of the fee. Remember that the $31,000 which the probate court awarded Maksym was subtracted from the amount of his bill to Mrs. Loesch. And remember that since the will in her favor was thrown out, she gets nothing from the estate. By giving Maksym $7,000 more than his contract with her entitled him to for his estate services, the probate court reduced by $7,000 the amount that he billed her on an hourly basis. As the hourly fee is unproblematic for the reasons just stated, something that reduces that fee still further cannot be complained of.

■ But all this assumes that the retainer agreement authorized Maksym to charge Mrs. Loesch for the services that he rendered to her personally, as distinct from the services that he rendered to the estate, for which the probate court compensated him out of the estate's assets. Ordinarily this issue would have little practical significance. If these services were not covered by the contract, Maksym would still be entitled to collect for them, only by a suit not on the contract but for quantum meruit, since the usual office of such a suit is, precisely, to recover for the value of services rendered under a reasonable expectation of compensation albeit the terms of compensation were not specified in a legally enforceable contract. And undoubtedly the court would place considerable weight on the terms of the contract in deciding what Maksym's services had been worth. *Restatement of Contracts, Second,* § 143, comment a, illustration 1 (1981); 2 Farns-

worth, *supra*, § 6.11, at p. 173. (For a pertinent example, see *Oxborough v. St. Martin*, 169 Minn. 72, 210 N.W. 854 (1926).) But Maksym did not bring this suit until seven years after Dolores Loesch discharged him. That was time enough for a suit on a written contract, for which the statute of limitations in Illinois is ten years, Ill.Rev.Stat. ch. 110, ¶ 13–206, but not for a suit for quantum meruit, for which the statute of limitations is only five years. *Id.*, ¶ 13–205. Mrs. Loesch argues that the statute of limitations began to run in 1981, when she discharged Maksym, not, as he argues, in 1986, when the probate court fixed the compensation to which he was entitled from the assets of the estate. Another possible date would be when the probate court valued the estate, for until then the precise amount of Maksym's fee was not determined. But we cannot find that date in the record; and anyway Mrs. Loesch's position on when the statute of limitations for a claim of quantum meruit began to run is strongly supported by decisions interpreting the same statute of limitations when it is applied to suits on an oral contract. *Axelrod, Goodman, Steiner & Bazelon v. Chicago Messenger Service, Inc.*, 73 Ill.App.3d 415, 416, 29 Ill.Dec. 639, 640, 392 N.E.2d 196, 197 (1979); *Matchett v. Rose*, 36 Ill.App.3d 638, 647–48, 344 N.E.2d 770, 778 (1976). But it makes no difference to the outcome. For, properly interpreted, the written contract with its generous ten-year statute of limitations embraces the services that Maksym rendered to Mrs. Loesch personally.

■ This is true notwithstanding the principle that a lawyer discharged by his client is limited to a suit for the fair value of his services. There is an exception, we said, for the case (this case) in which the suit is for accrued fees, based on services rendered already. But a more fundamental point is that the principle of quantum meruit, as applied to suits by lawyers on valid contracts, supplies not the cause of action—the contract supplies that—but rather a ceiling on contractual recovery. If the lawyer has a fee contract the suit is on the contract, even though the court may decide not to award the full contractually

specified fee because the lawyer had not, prior to being discharged, rendered services commensurate with it.

But does the contract actually cover the services for which Maksym seeks to hold Mrs. Loesch liable? The last sentence that we quoted from the contract ("if for any reason I [Dolores] shall not be successfully appointed as executor of the estate ..., any compensation for any of the above services rendered on my behalf shall then constitute a personal obligation of mine payable at the hourly rate provided for above, and may not constitute an obligation of the estate") implies that Maksym's fee was to be a personal obligation of Mrs. Loesch's, rather than just a charge against the estate's assets, only if she failed to be appointed executrix of her late husband's estate. And she was appointed executrix, albeit the appointment was withdrawn when she lost the will contest—but that was after she had discharged Maksym. A sentence must never be read in isolation, however, from the text of which it is a part. The contract read as a whole makes plain that Maksym was being hired in a dual capacity, as lawyer for the estate of which Dolores Loesch hoped to be appointed executrix by the probate court but also as lawyer for her in her capacity as the principal beneficiary of her late husband's last will. Such dual representation is commonplace in situations—themselves commonplace—in which the executor named in a will is also the principal beneficiary under it. That it was contemplated here is evident for example from the reference to Maksym's undertaking to defend the will contest. The benefit of such a defense would enure to Mrs. Loesch in her capacity as a beneficiary of the will that the daughters were contesting. The meaning of the contract was sufficiently plain to entitle the district judge to resolve the dispute without taking oral evidence.

■ Mrs. Loesch has one more string to her bow. She argues that the suit is barred by laches, Maksym having in her view delayed unconscionably, and to her prejudice, in waiting seven years to bring suit. Laches is an equitable doctrine but

one increasingly applied in cases at law (such as this case, since the plaintiff is seeking only damages) as well. *Moore v. Phillips,* 6 Kan.App.2d 94, 98, 627 P.2d 831, 835 (1981); *Harris v. Beynon,* 570 F.Supp. 690, 692 n. 3 (N.D.Ill.1983). Not only is there a long tradition of applying equitable defenses in cases at law—indeed, fraud itself is an equitable defense typically interposed in suits at law for breach of contract—but with the merger of law and equity (Fed.R.Civ.P. 2) there is no longer a good reason to distinguish between the legal and equitable character of defenses, save as the distinction may bear on matters unaffected by the merger, such as the right to trial by jury in cases at law, a right preserved in federal courts by the Seventh Amendment—but there is nothing of that sort here.

In Illinois, however, the great weight of authority is that laches is a defense only in equity cases. *People ex rel. McCoy v. Sherman,* 123 Ill.App.3d 444, 78 Ill.Dec. 698, 462 N.E.2d 817 (1984); *Mother Earth, Ltd. v. Strawberry Camel, Ltd.,* 72 Ill. App.3d 37, 52, 28 Ill.Dec. 226, 239, 390 N.E.2d 393, 406 (1979); *Exchange Security Bank v. O'Gwin,* 24 Ill.App.3d 994, 322 N.E.2d 232 (1975) (abstract); *Strama v. City of Chicago,* 617 F.Supp. 422, 423 (N.D.Ill.1985). It is true that *Bays v. Mathews,* 108 Ill.App.3d 1112, 1116, 64 Ill. Dec. 590, 593, 440 N.E.2d 142, 145 (1982), says that laches applies to *sui generis* procedures such as mandamus, which are equity-like in being orders to do or not do rather than orders to pay. But *Bays* contains no suggestion that laches would apply to a suit for damages, which is what this case is. And in fact the cases from jurisdictions which say that laches is a defense in suits at law as well as suits in equity turn out to be—every one that we can find, at any rate—quasi-equitable suits, like *Bays,* and not pure damages suits, like this suit. Compare *Clark v. Amoco Production Co.,* 794 F.2d 967, 971 (5th Cir.1986), with *Grant Airmass Corp. v. Gaymar Industries, Inc.,* 645 F.Supp. 1507, 1515 (S.D. N.Y.1986).

One might have supposed that in any event laches would have no place in a case such as this where suit is brought *before* the expiration of the statute of limitations. *Clark v. Amoco Production Co., supra,* 794 F.2d at 972. Its normal application is to cases where there is no statute of limitations, which may be why defendants in damages suits rarely try to invoke it. Yet Illinois courts have sometimes invoked laches to bar suits that had been brought within the statutory period. *Slatin's Properties, Inc. v. Hassler,* 53 Ill.2d 325, 330, 291 N.E.2d 641, 643 (1972); *Aiardo v. Village of Libertyville,* 184 Ill.App.3d 653, 659, 132 Ill.Dec. 939, 944, 540 N.E.2d 861, 866 (1989); *G'Sell v. N.P. Associates, Ltd.,* 153 Ill.App.3d 171, 175, 106 Ill.Dec. 268, 271, 505 N.E.2d 1059, 1062 (1987); *Beynon Bldg. Corp. v. National Guardian Life Ins. Co.,* 118 Ill.App.3d 754, 764, 74 Ill.Dec. 216, 223, 455 N.E.2d 246, 253 (1983). The mystery is dispelled when we recall that laches requires proof not only of unwarranted delay in bringing suit but also of harm to the defendant as a result of the delay. *G'Sell v. N.P. Associates, Ltd., supra,* 153 Ill.App.3d at 175, 106 Ill.Dec. at 270–71, 505 N.E.2d at 1061–62. It is really a doctrine of estoppel rather than a substitute for a statute of limitations. *Mitchell v. Mitchell,* 575 S.W.2d 311, 312 (Tex.Civ. App.1978). So the fact that Maksym sued Mrs. Loesch within the statutory period does not defeat the defense of laches: only the fact that his suit is a suit for damages.

Affirmed.